**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0139n.06

No. 10-3713

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Feb 06, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| KIRK TEETS; BRANDY TEETS, | ) | |
| | ) | |
| **Plaintiffs-Appellants,** | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| CUYAHOGA COUNTY, OHIO; | ) | |
| CUYAHOGA COUNTY DEPARTMENT | ) | |
| OF CHILDREN AND FAMILY SERVICES; | ) | |
| ARLENE SPENCER; BARBARA MORUS, | ) | **O P I N I O N** |
| | ) | |
| **Defendants-Appellees.** | ) | |
| _____ | ) | |

Before: MOORE and GRIFFIN, Circuit Judges; and QUIST, District Judge.[*]

KAREN NELSON MOORE, Circuit Judge. Plaintiffs-Appellants Kirk and Brandy Teets

appeal the district court's grant of summary judgment in favor of Defendants-Appellees Cuyahoga

County, Ohio ("the County"), the Cuyahoga County Department of Children and Family Services

("CCDCFS"), and individual social workers Arlene Spencer and Barbara Morus. The Teetses filed

suit under 42 U.S.C. § 1983, alleging substantive and procedural due process violations as a result

of CCDCFS's and the social workers' alleged misstatements and material omissions in connection

with an investigation of sexual-abuse allegations by Brandy Teets's daughter A.F. against her

---

[*]The Honorable Gordon J. Quist, Senior United States District Judge for the Western District of Michigan, sitting by designation.

stepfather Kirk Teets. The district court granted the defendants' motion for summary judgment as to all claims, finding that the Teetses had not established any substantive or procedural due process violation. We agree and therefore **AFFIRM**.

## I. BACKGROUND

### A. Spencer's Investigation

On March 28, 2006, middle-school guidance counselor Sherry Porach reported a case of possible sexual abuse to the Cuyahoga County child-abuse hotline. The call was based on a written statement from A.F., the twelve-year-old daughter of Brandy Teets, that described a single instance of sexual abuse by her step-father, Kirk Teets. A short while later, CCDCFS social worker Arlene Spencer arrived at the school to begin investigating A.F.'s allegations. Spencer interviewed A.F. that day and, over the ensuing three-week period, conducted an investigation that included follow-up discussions with A.F. and interviews with A.F.'s family members. From her brief investigation, Spencer concluded that sexual abuse was "indicated,"[1] and the case was transferred to the ongoing investigation unit. R. 21-9 at 16 (Investigation & Assessment). Spencer's supervisor, Barbara Morus, concurred with Spencer's findings. Morus recounted that, "in the three weeks I had the case, the daughter had been interviewed by my worker, by the police, by the school counselor and had

---

[1]An indicated disposition means that, at the conclusion of the intake investigation, there is "some sort of circumstantial evidence to believe that abuse occurred." R. 21-13 (Morus Dep. at 33). In other words, the social worker "ha[s] reason to believe something is happening" but lacks "hard evidence" to prove it. R. 21-5 (Spencer Dep. at 41). Other potential dispositions are "substantiated," meaning there is actual evidence to confirm the abuse, such as a medical exam or perpetrator admission, and "unsubstantiated," meaning the allegation appears not to be credible. *Id.* at 41–42.

given the same story to three people." R. 21-13 (Morus Dep. at 46). During that period, "[A.F's] story did not change nor did she recant." *Id.*[2]

## B. Outside Investigations into A.F.'s Allegations

As Spencer was conducting her investigation, the Parma Heights Police Department began its own investigation into A.F.'s allegations. With a few minor discrepancies, A.F.'s statements to police were generally consistent with those she made to Spencer. At some point, however, police obtained a journal that A.F. had shared with a friend. The description of the incident in the journal contained a few differences from the description A.F. gave to Spencer and the police, the most notable of which was a statement that the incident lasted about three-and-a-half hours instead of the ten or fifteen minutes A.F. had described in her earlier interviews. Nonetheless, the Teetses have not presented any evidence to suggest that Spencer knew or had reason to know about the journal or this discrepancy. Aside from the journal, the other evidence gathered during this period generally supported the findings in Spencer's report. A medical report from MetroHealth Medical Center, for example, concluded that A.F.'s case was "[v]ery suspicious for sexual abuse" after performing its own examination and interview. R. 21-18 (Med. Report at 9).

---

[2]Brandy Teets did provide police with a tape-recorded recantation while the intake investigation was ongoing, but police and the CCDCFS social workers discounted the recantation because it strongly appeared that Brandy Teets had coerced A.F. into giving it. About a year and a half later, A.F. independently recanted her allegations against Kirk Teets, but the timing was well after Spencer's investigation was completed.

**C. State Court Proceedings in the Juvenile and Criminal Courts**

CCDCFS sought to place A.F. at a friend's house while the intake investigation was ongoing. When the original arrangement fell through, Spencer, on behalf of CCDCFS, filed a complaint in the Cuyahoga County juvenile court, alleging abuse and neglect and seeking temporary custody of A.F. A magistrate judge later determined by clear and convincing evidence that A.F. had been abused by her stepfather and awarded temporary custody to CCDCFS. In a subsequent hearing, the court adjudicated A.F. an "abused child" under Ohio law. R. 21-14 at 4 (Feb. 2, 2007 Judgment). Brandy Teets appealed the adjudication in state court, but her appeal was dismissed.

Based on their investigation, police and prosecutors also sought criminal charges against Kirk Teets, and a grand jury returned a bill of indictment against him for engaging in sexual conduct with a minor under the age of thirteen. Kirk Teets ultimately pleaded guilty to misdemeanor interference with custody in violation of Ohio Rev. Code § 2919.23(A)(1).

**D. The District Court Proceedings**

The district court granted the defendants' motion for summary judgment on May 12, 2010. After observing that "[t]he basis for all of Plaintiffs' claims is the assertion that Defendants made knowingly false allegations of child abuse against Plaintiffs," the district court concluded that "[t]here is no evidence in the record to support this assertion." R. 30 (Dist. Ct. Op. at 12–13). The district court reasoned that

> [w]hile Plaintiffs believe a different determination by CCDCFS was warranted, the alleged "inconsistencies or discrepancies" listed by Plaintiffs are immaterial to the claims raised by Plaintiffs in this case. There is no factual basis for Plaintiffs' assertion that Ms. Spencer intentionally fabricated evidence in an effort to support

4

> a finding of sexual abuse against Mr. Teets or that she failed to thoroughly investigate the claims of sexual abuse raised by A.F. Therefore, Defendants are entitled to summary judgment as a matter of law.

*Id.* The district court further concluded that the individual defendants were entitled to both absolute and qualified immunity and that the Teetses had failed to assert viable claims for supervisory or municipal liability under § 1983. The Teetses filed this timely appeal.

## II. LAW & ANALYSIS

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Gray v. City of Detroit*, 399 F.3d 612, 615 (6th Cir. 2005) (internal quotation marks omitted). We review de novo the district court's grant of summary judgment. *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).[3]

### A. The Teetses' Constitutional Claims

#### 1. Substantive Due Process

The Teetses first contend that CCDCFS and Spencer intentionally interfered with their Fourteenth Amendment right to familial association, and that there was a genuine issue of material

---

[3]Initially, the Defendants contend that the Teetses should be estopped from challenging Kirk Teets's alleged criminal admission that he sexually abused A.F. We disagree. Although Kirk Teets did plead guilty in criminal proceedings, the prosecutor had amended the charge to interference with custody in violation of Ohio Rev. Code § 2919.23(A)(1), which prohibits a person from knowingly or recklessly "entic[ing], tak[ing], keep[ing], or harbor[ing]" a child under the age of eighteen from his or her parent, guardian, or custodian. This is not an admission of sexual abuse that somehow bars our consideration of the Teetses' claims.

fact concerning whether the "investigation was undertaken (or continued) in bad faith or with a malicious motive" in violation of that right. Appellant Br. at 27.

"[T]he Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006).[4] But "the right to family integrity . . . is neither absolute nor unqualified." *Id.* at 690. Instead, it "is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Id.* As a result, "the right to familial association is not implicated merely by governmental investigation into allegations of child abuse." *Id.* Absent evidence of bad faith, improper motive, or investigation tactics that "shock the conscience," such investigations will not infringe on a family's fundamental rights. *Id.* at 691 & n.1.

Substantive due process claims come in two varieties: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pittman*, 640 F.3d at 728 (internal quotation marks omitted). Under either classification, however, the Teetses' contention that Spencer fabricated evidence and ignored conflicting accounts fails because the Teetses rely principally on manufactured discrepancies and evidence that did not exist at the time that Spencer was conducting her investigation. For example, that A.F.'s journal provides a different account of the incident is of no consequence because the Teetses have presented no evidence to demonstrate

---

[4]The Defendants contend that Kirk Teets does not have a constitutionally protected interest in familial association with A.F. because he is not a natural parent. We assume, for purposes of this opinion, that he does. The Sixth Circuit has not decided that question, but because the answer has no impact on our analysis, we need not resolve it here.

that Spencer ever knew of the alternative account. In addition, the Teetses' contention that Spencer failed to consider the possible influence of A.F.'s friend who had made similar allegations against a family member at about the same time, A.F's history of lying, and Kirk Teets's immediate denial is also unsupported; each of those facts is specifically listed in Spencer's investigation and assessment. Likewise, Spencer's observations about A.F.'s appearance and grades also appear to have been supported by contemporaneous evidence uncovered in the police investigation and A.F.'s medical exam. The bulk of the Teetses' remaining challenges to Spencer's report point only to minor inconsistencies, such as A.F.'s inability to pinpoint the exact date of the abuse and the presence of certain details in some reports but not others. Such differences are hardly material and would not reasonably have caused CCDCFS or Spencer to abandon the investigation, particularly in light of A.F.'s generally consistent statements to her guidance counselor, Spencer, and police.

Thus, even taking all facts in their favor, the Teetses' arguments amount to no more than allegations of negligence that fall far short of showing the requisite bad faith or intentional misrepresentation needed to sustain their claim. Indeed, if these facts alone were sufficient to withstand a motion for summary judgment, our decision would risk leaving scores of social workers subject to suit for legitimate child-abuse investigations. Such an outcome could have broad policy implications for state entities seeking to protect the best interests of dependent children, and we decline to incite such a result.

Finally, to the extent that the Teetses seek to hold Spencer, Morus, and CCDCFS accountable for subsequent criminal or juvenile court actions, that argument also fails. In *Pittman*, we rejected

7

a similar claim alleging that a social worker's "detrimental misrepresentations" in internal CCDCFS proceedings led the agency to seek custody in juvenile court, which the plaintiffs argued had deprived the father of his fundamental right to family integrity. 640 F.3d at 729. Because Ohio law refers custody decisions to the juvenile court, which has independent authority to conduct hearings and collect evidence, we held that even intentional misrepresentations by a social worker during an investigation leading up to Ohio custody proceedings do not violate the parent's substantive due process rights because the social worker has no independent ability to institute the alleged deprivation. *Id.* The same analysis applies here. Accordingly, the Teetses have failed to state a constitutional violation, and the district court properly granted summary judgment on their substantive due process claims.

### 2. Procedural Due Process

The Teetses next assert that their procedural due process rights were violated when A.F. was removed from their home without a predeprivation hearing. Soon after the investigation began, CCDCFS, in concert with the Teetses, developed a "safety plan" to remove A.F. from the Teetses' home and place her at a friend's house until A.F's allegations could be confirmed or dispelled. The Teetses now claim that their agreement to the plan was involuntary. Specifically, Brandy Teets contends that she acquiesced only because she "felt like [she] had no choice." R. 21-3 (Brandy Teets Dep. at 32). She believed that "[t]he only way I could keep my daughter [A.F.] was to go to a

women's shelter and battered home and I wasn't putting my family through that. I wasn't given many options." *Id.*[5]

Because of a parent's fundamental liberty interest in the custody of his or her child, "state intervention in the relationship between a parent and child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). Thus, even for temporary deprivations of custodial rights, parents are generally entitled to a hearing "within a reasonable time." *Id.* Such hearings, however, are required only when a child's removal is instituted or sustained over the parents' objections. *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008). In contrast, a parent's voluntary consent to a safety plan obviates the need for any additional due process procedures on the part of the agency seeking to remove the child from a parent's custody. *Id.*

In this case, the Teetses' assertion that the initial safety plan was involuntary is belied by Kirk Teets's admission that he and his wife "[a]bsolutely" agreed to it. R. 21-10 (Kirk Teets Dep. at 37). The Teetses point to no evidence to suggest that they ever sought and were denied custody of A.F. after the safety plan to which they agreed was put into place. Furthermore, even if we credit Brandy Teets's statement that she felt coerced, that fact alone is not enough to establish that the safety plan was involuntary. *See Smith*, 520 F.3d at 600 (citing *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006)) (rejecting the parents' claim that "safety plans are inherently coercive when agencies force parents

_____

[5]After a problem arose with the original placement, CCDCFS and the Teetses met to create a new safety plan, which resulted in CCDCFS seeking custody through the juvenile court. The Teetses do not appear to contest the revised plan.

to sign the plan or face the threat of formal removal proceedings" and concluding that "this strategy" does not undermine the voluntary nature of a safety plan). Thus, the district court did not err in finding no genuine issue of material fact regarding the Teetses' procedural due process claim.

## B. The Teetses' Municipal Liability Claims Against the County and CCDCFS

The Teetses finally contend that the County and CCDCFS are liable under a theory of municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977). The Teetses maintain that such liability is warranted on account of CCDCFS's unconstitutional "'guilty until proven innocent' policy regarding child abuse allegations." Appellant Br. at 40.

To succeed on a municipal-liability claim, a plaintiff must demonstrate an official policy or custom that is either "facially unconstitutional as written or articulated" or has been implemented in such a manner as to demonstrate "deliberate indifference" to the "plainly obvious" risk of constitutional violation. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 127 S. Ct. 962 (2007). Furthermore, liability under *Monell* "must rest on a direct causal connection between the policies or customs of the [local government entity] and the constitutional injury to the plaintiff." *Gray*, 399 F.3d at 617.

Read as a whole, Morus's deposition testimony does not support the existence of a guilty-until-proven-innocent policy at CCDCFS. Rather, it depicts an investigational process aimed at balancing the need to ensure that victims are comfortable coming forward with claims with a continual reevaluation of victim allegations to determine their truthfulness. In addition, even if Morus's statements had indicated that she advocated a guilty-until-proven-innocent standard, the

Teetses provide no evidence to suggest that Morus was an official policymaker or that the County or CCDCFS endorsed that viewpoint. *Cf. Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (noting an "official must be 'responsible for establishing final government policy respecting [an] activity before the municipality can be held liable.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion))), *cert. denied*, 130 S. Ct. 3504 (2010). Accordingly, the Teetses have failed to demonstrate an unconstitutional policy or custom at CCDCFS, and the district court correctly concluded that they cannot recover from CCDCFS or the County on this theory of liability.

**C. Supervisor Liability and Qualified and Absolute Immunity**

Because the Teetses have failed to show that Spencer's investigation violated their constitutional rights, we decline to address the Teetses' assertion that Morus should be subject to supervisor liability on account of her role in approving Spencer's work. Furthermore, because the Teetses have failed to identify any constitutional injury, we also decline to address the parties' arguments concerning the applicability of qualified or absolute immunity to Spencer and Morus.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the County, CCDCFS, and the individual social workers, Arlene Spencer and Barbara Morus.